G. R. WESTFELT v. W. S. ADAMS.

(Filed 28 May, 1912.)

1. Interpretation of Statutes—Construed Together.

Statutes relating to the same subject-matter should be interpreted to harmonize with each other when it can reasonably be done.

2. Cherokee Indian Lands—Entry—Interpretation of Statutes.

Lands acquired by treaty with the Cherokee Indians in 1817 and 1819, and not already surveyed, were made subject to entry by Public Laws 1835, chap. 6; and the act of 1836-37, amending the act of 1835, refers to the Cherokee lands which had been reserved or allotted to "any Indian or Indians" under the treaties of 1817 and 1819 and afterwards bought by the State, and not to the lands then acquired under the treaties, providing, as to the lands reserved or allotted to "any Indian or Indians," that they be sold in the manner pointed out by the statute, and prohibiting entry as to them.

3. Same—Grants—Amendatory Acts—Repeal.

The acts of 1836-37, requiring that the Cherokee Indian reservations be surveyed and sold, were passed several days before the Revised Statutes which incorporated the acts of 1835-36, permitting entry upon the Cherokee Indian lands acquired by the State under treaty with the Indians, and by the express terms of the Revised Statutes the acts of 1835-36 did not take effect until after the ratification of the act of 1836-37: *Held,* the act of 1836-37 is not in conflict with the act of 1835-36; but, if otherwise, it was repealed by the Revised Statutes.

4. Cherokee Indian Lands — Treaties — Vacant Lands—Evidence—
   ·Location.

In order to ascertain whether there were any lands acquired by the State by treaty with the Cherokee Indians in 1817-1818 lying west of the Meigs and Freeman line and situated in Macon

County, which were vacant and subject to entry, the Court will consider the act of 1852, chap. 70, validating entries of a certain entry-taker in Macon County made after the expiration of his term of office; acts of 1852 authorizing entries of lands in said county, and others of like nature.

### 5. Same—Burden of Proof—Presumptions.

The defendant having introduced his grants for lands lying in Macon County west of the Meigs and Freeman line, which were issued 10 November, 1854, upon entries made 15 February, 1850: *Held*, in the absence of proof to the contrary, it will be assumed that the lands entered were a part of those acquired by the State from the Cherokee Indians in 1817 and 1819, which were open to entry at that time, if there were no other land in that county then subject to entry.

### 6. State's Lands—Grants—Presumptions—Vacant Lands—Evidence —Collateral Attack.

While it is true that a State's grant of land cannot be attacked collaterally for fraud or irregularity and there is a presumption that it is valid and that all requisite preliminary steps have been taken, the officer must have had power or jurisdiction to issue the grant, and it may be shown collaterally that the lands described in the entries and grants were not subject to entry.

### 7. State's Lands—Grants—Location—Evidence—Entries.

It is competent for the jury to consider the boundaries contained in an entry of land as evidence on a disputed location of the land claimed under the grant issued upon the entry, where the location of the land is not positively and clearly shown by the survey and the grant, though in a certain sense the entry is not a part of the documentary title, and the survey and description in the grant controls if sufficiently definite for location upon its face.

### 8. State's Lands— Grants — Entries—Location—Evidence—Instructions—Court Opinion on Evidence.

In this action, involving title to lands in dispute claimed by defendants under certain grants from the State, it was error for the trial judge to direct an affirmative answer to an issue when by so doing he withdraws from the consideration of the jury descriptions in the defendant's entries, and parol evidence tending to show that the lands claimed did not include the *locus in quo*.

### 9. Issues—Misleading—Pleadings.

Issues should be framed from the pleadings, and those in this case are not commended.

APPEAL from *Justice, J.,* at September Term, 1910, of HAY-WOOD.

This action was brought by the plaintiffs to recover the pos-session, and damages for the detention, of a tract of land in the county of Swain, on the waters of the Tennessee River, known as Section No. 2325, containing 640 acres, and described as follows: "Beginning at a chestnut on the west side of the Jenkins Trail leading to the Smoky Mountains, and runs thence east four hundred and ninety (490) poles to a stake; thence south two hundred and five (205) poles to a stake; thence west four hundred and ninety (490) poles to a white oak; thence north two hundred and five (205) poles to the beginning." There are allegations in the complaint that the plaintiffs are the owners in fee of the land and entitled to the possession, and that the defendants are in possession of the same and unlaw-fully and wrongfully withhold the possession from the plain-tiffs. These allegations are denied in the answer, and the defendants specially aver, as a defense and counterclaim, that they are seized in fee, as owners, of two tracts of land in the county of Macon, bounded and described as follows:

1. Beginning at a mountain oak on the Little Forked Ridge and runs south 45 west 100 poles to a stake; thence north 45 west 160 poles to a stake; thence north 45 east 100 poles to a stake; thence south 45 east 160 poles to the beginning, being State Grant No. 1545, issued 10 November, 1854.

2. Beginning at a birch, and runs north 160 poles to a stake; thence west 100 poles to a stake; thence south 160 poles to a stake; thence east 100 poles to the beginning, being State Grant No. 1546, issued 10 November, 1854.

That said two tracts of land are located on the ridge lying between Sugar Fork Creek and Haw Gap Creek, commonly known as the Little Fork Ridge, and so called, and are the lands whereon the defendants were conducting mining operations at the date of the commencement of this action.

It is further alleged in the answer: "That the plaintiffs unlawfully and wrongfully claim an interest in said land, and to be the owners of the same, pretending that they are embraced within the boundaries of the tract of land described in the

complaint herein, which said pretended claim the defendants say has no foundation in fact." Judgment is prayed that the plaintiffs take nothing by their suit, and that the defendants go without day, and, further, that defendants are the owners of the said two tracts of land, and that plaintiffs and their privies in estate be enjoined perpetually from hereafter·making any claim or asserting any title thereto.

When the case was called for trial, plaintiffs tendered the following issues:

1. Are the plaintiffs the owners of the lands described in the complaint and indicated on the official plat by lines H, P, O, N, in black?

2. Are the defendants in wrongful possession of said lands?

3. What damage, if any, are plaintiffs entitled to recover?

The court refused to adopt these issues and, instead thereof, submitted issues to which the jury responded, as follows:

1. Are the plaintiffs the owners and entitled to the possession of the land described in the complaint, without regard to its location, provided the defendant's Grants Nos. 1545 and 1546 are not located on it? Answer: Yes.

2. Is the tract of land described in plaintiffs' complaint, Grant No. 2325, located as designated on the maps, beginning at the point marked H and to P, O, N, in black letters on the maps? Answer: No.

3. Is the plaintiffs' tract, Grant No. 2327, located as designated on the maps, beginning at the point marked H and to I, R, Q, in black letters on the maps? Answer: No.

. 4. Are the defendants the owners and entitled to the possession of the two tracts of land described in the answer, Grants Nos. 1545 and 1546, without regard to their location? Answer: Yes.

5. Is the tract, Grant No. 1545, located as designated on the maps, beginning at point marked Mountain Oak, W, and to X, Y, Z, in red letters on the maps? Answer: Yes.

6. Is the tract, Grant No. 1546, located as designated on the maps, beginning at point marked birch, S, and to T, U, V, in red letters on the maps? Answer: Yes.

Plaintiffs excepted to the ruling of the court upon the issues. There was much evidence taken in the case and many exceptions noted to the rulings of the court, which we will consider in the order of their statement in the record. Judgment was entered on the verdict for the defendants, and the plaintiffs appealed.

*A. C. Avery, F. A. Sondley, T. F. Davidson, and J. C. Martin for* plaintiffs.

*J. H. Merrimon, Moore & Rollins, Aycock & Winston, and J. J. Hooker for defendant.*

WALKER, J. It is conceded that the land in controversy is a part of the land acquired by the State under treaty with the Cherokee Indians. The fact is recited in the grant, under which the plaintiffs claim, that the land therein described is "a part of the land lately acquired by treaty from the Cherokee Indians," and the defendants, in their brief, thus refer to the grants under which they claim: "It seems clear, therefore, that the lands embraced in grants numbered 1545 and 1546 were of 'vacant and unsurveyed lands acquired by treaty of 1817 and 1819,' and made subject to entry from 1 May, 1836, by Public Laws 1835, chap. 6, page 7." The plaintiffs' grant was issued to E. H. Cunningham, assignee, on 28 April, 1860, upon an entry made by Daniel L. McDowell, of 640 acres, which the grant recites was sold for $64, as Indian land, under an act of the Legislature. The grants of the defendant, Nos. 1545 and 1546, and each for 100 acres, were issued on 10 November, 1854, upon entries made on 15 February, 1850. The grants so recite, and the entries, upon which they are based, were put in evidence by the plaintiffs. There was no attack made by the defendants upon the title of the plaintiffs to the lands claimed by them, so far as the validity of the grant issued to their predecessor, E. H. Cunningham, is concerned; but the defendants contended solely that the plaintiffs had failed to locate their grant and to show that it embraced any of the lands in dispute. There was a sharp and protracted controversy between the parties as to the true location of the several grants introduced by them, the defendant denying that

the plaintiff's Grant No. 2325, which was alleged by them to include the *locus in quo,* or Grant No. 2327, upon which plaintiffs relied to show the location of Grant No. 2325, had been correctly located, and the plaintiffs denying that Grants 1545 and 1546 had been correctly located by the defendants.

There was much testimony introduced by the parties to support their respective contentions, but we will not refer to any of it at present, as we deem it proper to consider, in the beginning, the validity of the defendants' Grants 1545 and 1546, which are assailed by the plaintiffs, for if they are invalid, the question of location as to them will become immaterial, except in so far as the evidence upon that question and the charge of the court with respect thereto may have been prejudicial to the plaintiffs in the location of their grants.

The validity of the defendants' grants must depend upon the proper construction of the Cherokee laws. As said in the defendants' brief: "The Indian title, or right of occupation, was extinguished by the following treaties made and concluded between the United States and the Cherokee Nation or tribe of Indians, to wit: The Treaty of Holstein of 2 July, 1791, 7 U. S. Stat., 39; The Treaty of Tellico of 2 October, 1798, 7 U. S. Stat., 62; The Treaty of 8 July, 1817, 7 U. S. Stat., 156; The Treaty of 27 February, 1819, 7 U. S. Stat., 195; The Treaty of New Echota of 29 December, 1835, 7 U. S. Stat., 478."

At a very early period, the entry of lands within the Indian hunting grounds, or of any lands either ceded by the Indians or conquered from them, was forbidden by statute, and the bounds of such Indian lands were carefully delineated. Act of 1778, chap. 132; act of 1783, chap. 185, which will be found in Potter's Revisal, pp. 354 and 484. By the act of 1809, chap. 774 (Potter, p. 1161), it was provided as follows: "The land lying west of the line run by Meigs and Freeman, within the bounds of this State, shall not be subject to be entered under the entry laws of this State; but the same, when the Indian title shall be extinct, shall remain and inure to the sole use and benefit of the State; any law to the contrary notwithstanding. All entries made, or grants obtained, or which may hereafter

be made or obtained, shall be null and void." The last act, as its preamble, and even the language we have quoted, evidently show, was intended to apply to Indian lands only, and there may not have been any other land west of the Meigs and Freeman line. By the treaties of 1817 and 1819 the State acquired a large area of land from the Cherokee Indians, which by the act of 1819, chap. 10, was directed to be disposed of by sale, after being surveyed, except such as would not command a certain price, and those lands, which were called the "residue," were "reserved" for future disposal by the Legislature, and the act prohibited the entry of lands so acquired. In 1823 the State acquired by purchase from certain individuals of the Cherokee tribe of Indians the lands which, under the treaties of 1817 and 1819, had been allotted to them, and did not, of course, pass to the State by the treaties.

The policy of the State from the beginning, in regard to the Indian lands acquired by treaty, had been, and continued to be until the year 1935, that none of said lands should be subject to entry, but should be disposed of by sale only, as provided in the several acts of the Legislature relating thereto, which, however, differed in some particulars or details from each other, though substantially alike and enforcing the general purpose to withhold them from entry. But by the act of 1835, chap. 6, it was provided that the lands acquired by the treaties of 1817 and 1819, and which were "vacant and unsurveyed," should be subject to entry as other lands in the State, and by act of 1836, chap. 7, the lands purchased from the Indians in 1823 were excepted from the operation of the act of 1835, or, to be more accurate, the latter act was declared not applicable to them, and the Legislature had made no provision for their disposal by sale or otherwise. They were simply owned by the State, but not subject to entry.

So far the legislation of the State relating to the Cherokee lands is comparatively easy of construction, and we may say that the legislative meaning is plain and unmistakable.

In 1835, by treaty with the Cherokees, the State acquired additional lands, and by act of 1836, chap. 9, provided for the survey and sale of such part of the lands, lately acquired by

treaty with the Cherokee Indians, as would bring a certain price, and reserved the residue for the future disposal of the Legislature, and prohibited entry of the same. This act provides further, in sections 20 and 21, as follows: "It shall be the duty of the commissioner to be appointed by virtue of this chapter to cause to be surveyed and offered for sale all the reservations remaining undisposed of in the county of Macon, under the same rules and regulations that are provided for the surveying and selling the lands lately acquired by treaty from the Cherokee Indians. And it shall be the duty of the said commissioners of sale to expose again to sale all the lands already surveyed and now remaining unsold in the county of Macon aforesaid."

The act of 1835 was inserted in the Revised Statutes of 1837, as a part of section 1 of chapter 42, on Entries and Grants, which reads as follows: "All vacant and unappropriated lands belonging to this State shall be subject to entry in the manner herein provided, except in the cases hereinafter mentioned. It shall not be lawful for any entry-taker to receive an entry for any lands lying to the westward of the line run by Meigs and Freeman in the year 1802, as the then boundary line between this State and the Cherokee Nation, except the vacant and unsurveyed lands that have been acquired by treaty from the Cherokee Indians in the years 1817 and 1819."

The act of 1835 was amended by acts of 1836-7, chap. 7, which provided that it should not apply to the land reserved or allotted to the Indians in the treaties of 1817 and 1819, which, therefore, were not subject to entry, and the amending act of 1836-7 was inserted in the Revised Statutes as section 36 of chapter 42, which is as follows: "Nothing in this act contained shall be so construed as to authorize or allow the entry of any portion of the Cherokee lands which were reserved or allotted to any Indian or Indians under the Cherokee treaties, which the State has since acquired by purchase; and the Secretary of State is hereby directed to issue no grant for any portion of the lands of the latter description until the General Assembly shall otherwise order and direct."

The "Act concerning the Revised Statutes" provided that certain enumerated acts therein contained, including the chapter or act on entries and grants, but not including the act of 1836-7, relating to the survey and sale of Indian lands, should take effect on 1 January, 1838. It also provided that the acts of a public nature passed by the Legislature in 1836-7, with one exception, should be published in the first volume of the Revised Statutes with the acts enumerated therein, and to which we have referred, and other acts were required to be published in the second volume. The chapter concerning entries and grants was published in the first volume of the Revised Statutes, and the act of 1836-7, relating to the survey and sale of Indian lands, in the second volume, under the title, "Cherokee Lands," with other laws upon that subject. The act of 1836-7, amending the act of 1835, so as to exclude the lands purchased from the Indians from its operation and prohibiting the entry of them, was ratified 10 January, 1837; the other act of 1836-7 on 20 January, 1837, and the Revised Statutes on 23 January, 1837. This gives, as briefly as we can state it, the legislative history of these several statutes.

The plaintiffs contend that the act of 1835, authorizing the entry of the vacant and unsurveyed Indian lands, was repealed by the act of 1837, passed 20 January, because by the twentieth section of the latter act the commissioners are required to survey and sell all the Indian reservations in Macon County undisposed of at that time, while the defendants contend that the act of 20 January, 1837, sec. 20, refers to the land known as the Indian reservation, which had been acquired by contract or purchase in 1823 (Acts of 1823, chap. 9), which contract was ratified by Acts of 1824, chap. 11, sec. 2 (Revised Statutes, pages 196 and 198), and they rely upon subsequent statutes recognizing the fact that there were lands in the county of Macon which were subject to entry under the general law, viz.: Act 1852, chap. 70, recites that William Tatham, former entry-taker of Macon County, had received entries, in 1850 and 1851, after the expiration of his term of office, and the Legislature provided that entries made in the entry-taker's office of said county, and all warrants, surveys, and grants based thereon, in

159—27

the past or the future, should be valid, as if William Tatham had rightfully held said office. Acts of 1852, chap. 169, authorized entries of lands in Macon and Haywood counties under the provisions of that act, at the present rates, and declared that all lands theretofore entered in said counties and not paid for, could be paid for as therein provided for lands lying in Cherokee County, the money received by the entry-takers of said county to be paid "to the contractors for making the Western Turnpike Road, on the certificate of the proper agent." It is also contended that Acts of 1850-51, chap. 25, secs. 5 and 6, clearly show that there was land in Macon County which was subject to entry immediately prior to the passage of that statute. The lands in dispute lie in the county of Swain, the territory of which was taken from the county of Macon in 1871. It is argued that as there were no lands in Macon County which were not acquired from the Cherokee Indians, whether by treaty or purchase, and none west of the Meigs and Freeman line, the lands thus subject to entry must, of necessity, have been Indian lands; and if this be true, it follows that they were the lands opened for entry by the act of 1835.

We are satisfied, from a careful examination of this question in every conceivable aspect, that the contention of the defendants is justified by the facts. We are convinced that there were no lands west of the Meigs and Freeman line which were the subject of entry prior to 1851, other than the lands mentioned in the act of 1835, which were acquired by the treaties of 1817 and 1819 from the Cherokees. Section 20 of the act of 1836 evidently referred to the lands reserved to certain individuals of the Cherokee tribe, otherwise the statutes upon this subject cannot well be harmonized, and it is our duty to reconcile them, if it can reasonably be done.

The chapter on entries and grants in the Revised Statutes will appear, by reference to the Legislative Journals of 1836-7, to have been what was called one of the "revised acts," and was passed one or two days after the act of 1836-7, requiring the Indian reservations to be surveyed and sold. It also appears that the chapter on entries and grants of the Revised Statutes (which includes the act of 1835) did not take effect,

by the terms of the first chapter of that revisal, until 1 January, 1838, whereas the act of 1836-7 was ratified 20 January, 1837, and took effect thirty days after the rise of the General Assembly of that year, which adjourned on 23 January, 1837, as will appear by the journals. If, therefore, the act of 1836-7 is in conflict with the act of 1835, it was repealed by the Revised Statutes, the first section of the chapter on entries and grants, authorizing the entry of vacant and unsurveyed Indian lands acquired by the treaties of 1817 and 1819, having taken effect with the other revised statutes on 1 January, 1838, much later in date than the time when the act of 1836-7 was ratified and in force.

It further appears, as we have already shown, that by several subsequent acts of the Legislature, the fact is established that lands were being entered in Macon County in 1850 and 1851, if not prior to those years. The warrants of survey, under the entries upon which Grants 1545 and 1546 issued, were signed by William Tatham on 15 February, 1850, and these entries and warrants were put in evidence by the plaintiffs. The act passed in 1836-7, providing for the sale of the Indian lands, refers to those acquired by the last treaty in 1835.

We conclude, therefore, that the vacant and unsurveyed lands, acquired by the treaties of 1817 and 1819, were the subject of entry in February, 1850, when defendants' entries were made; and we must assume, in the absence of any proof to the contrary, that the lands entered by Jonathan Hill in February, 1850, were a part of those lands. *Harshaw v. Taylor,* 48 N. C., 513; *Dosh v. Lumber Co.,* 128 N. C., 84. The act of 1852, chap. 169, opened land in the Cherokee boundary to entry in a restricted way, and it was not until 1883 (Code, vol. 2, secs. 2478, 2479) that all of the Cherokee lands were made the subject of entry and grant under the general law of the State relating to the subject.

Plaintiffs' counsel contend that this Court, in *Stanmire v. Powell,* 35 N. C., 312; *Lovinggood v. Burgess,* 44 N. C., 407, and *Frasier v. Gibson,* 140 N. C., 272, has decided that no entry of any of the Cherokee lands could be made prior to 1852;

but we do not so construe those cases. The first two related to land in Cherokee County, which was not affected by the act of 1835, as it was not acquired by the treaties of 1817 and 1819, but by the treaty of 1835; and the act of 1836-7 provided for the survey and sale of the lands in that county. What was said in *Frasier v. Gibson* had reference to the lands acquired by treaty of 1835 and to the act of 1836-7, authorizing a survey and sale of them. The immediate context clearly shows that this is what was meant by the learned justice who wrote the opinion of the Court, and it is now fully conceded, and it must be admitted, that the act of 1835 did authorize the entry of a part of the lands acquired by the treaties of 1817 and 1819. It would be strange indeed that an office was open in Macon County in 1850 for the purpose of receiving entries of land, if there were no lands in the county which were subject to entry, and plaintiffs introduced in evidence several entries made during that year. No satisfactory reason has been given for this strange anomaly. Besides, we cannot think that the Legislature would validate entries filed with William Tatham because his term of office had expired, as it did by the act of 1852, chap. 70, if it was not lawful to make entries of land in Macon County at that time and the entries thus made and the warrants of survey issued thereon were void. That act purports to validate all entries made in Macon County prior to 1852, though the reason assigned is that the official term of Tatham had expired.

It is true that a grant cannot be attacked collaterally for fraud or irregularity. There is a presumption that a grant is valid and that all preliminary steps have been taken which are required by law. *Chief Justice Marshall* stated the rule clearly in *Polk v. Wendal,* 9 Cranch (U. S.), 87, as follows: "The laws for the sale of public lands provide many guards to secure the regularity of grants, to protect the incipient rights of individuals, and also to protect the State from imposition. Officers are appointed to superintend the business, and rules are framed prescribing their duty. These rules are, in general, directory, and when all the proceedings are completed by a patent issued by the authority of the State, a compliance with

these rules is presupposed. That every prerequisite has been performed is an inference properly deducible, and which every man has a right to draw from the existence of the grant itself." *Lovinggood v. Burgess,* 44 N. C., 407; *Strother v. Cathey,* 5 N. C., 102; *Stanmire v. Powell,* 35 N. C., 312. But all this presupposes that the officer had power or jurisdiction to issue the grant. "If they (the lands) never were public property or had previously been disposed of, or if Congress had made no provision for their sale, or had reserved them, the department would have no jurisdiction to transfer them, and its attempted conveyance of them would be inoperative and void, no matter with what seeming regularity the forms of law may have been observed. The action of the department would, in that event, be like that of any other special tribunal not having jurisdiction of a case which it had assumed to decide." *Smelting Co. v. Kemp,* 104 U. S., 636. "When the lands are not, in fact, vacant and unappropriated, or when the law forbids entry of vacant land in a particular tract or country, a grant for a part of such land is absolutely void; and that may be shown on the trial in an action of ejectment." *Board of Education v. Makely,* 139 N. C., 37.

These being Cherokee lands, therefore, we do not see why the plaintiffs may not show, if they can, that the lands described in the defendants' entries and grants were not a part of the vacant and unsurveyed lands acquired by treaties with the Indians in 1817 and 1819, and therefore were not subject to entry. *Janney v. Blackwell,* 138 N. C., 439. This course was taken and approved in *Harshaw v. Taylor,* 48 N. C., 513.

*Justice Connor* said in *Janney v. Blackwell, supra:* "It follows, therefore, that if one lay an entry upon and procure a grant for land covered by a grant, he acquires no title thereto, for the reason that the State has by the senior grant parted with its title. *Stanmire v. Powell,* 35 N. C., 312. If the land be open to entry and a grant be issued therefor, such grant may not be attacked collaterally for fraud, irregularity, or other cause. This can be done only by the State or by pursuing the provisions of section 2786 of The Code. But if the land be not subject to entry, the grant is void, and may be attacked collaterally."

And *Judge Pearson* said in *Harshaw v. Taylor, supra:* "But it was properly admitted by the plaintiff's counsel, that the grant to him could not be supported by the aid of that statute (act of 1852), because the statute only authorizes the entry and grant of vacant and unsold land, whereas the land in controversy had been previously surveyed and sold according to the provision of the statutes in reference to land lying in the county of Cherokee."

The defendants' counsel admit that there were no lands in Macon County other than those acquired from the Indians in 1817 and 1819, which could be entered in the year 1840.

The statutes which have any material bearing upon the questions herein discussed are collected, in the order of their enactment, in The Code of 1883, chap. 11, except the act of 1835, the act of 1836-7 exempting land purchased in 1823 from the operation of that act, and the act of 1852 relating to entries filed in the office of William Tatham, to which full reference has been made.

But while the court correctly held the defendants' grants to be valid, upon the evidence as it now appears, there was error in other respects. Upon a careful examination of the charge, we think the court substantially told the jury that, in locating the several grants, they need not consider the entries. It is true that, in a certain sense, the entry is not a part of the documentary title, and that the survey and description in the grant must control; but that is no reason why the entry should be disregarded altogether, and especially in a case like this one, where the location of the land is not positively and clearly shown by the survey and grant. All of the grants call for trees—chestnut, mountain oak, and birch—as the beginning corners of the several tracts, and the remaining description is equally as indefinite.

The plaintiffs contended that the defendants' land, as described in grants 1545 and 1546, were on the waters of Eagle Creek, as described in the entries, and not on or near the waters of Haw Gap Creek and Sugar Fork Creek, and that the Little Fork Ridge, mentioned in Grant 1545, was far north of the place at which defendants located their two grants,

and near the waters of Eagle Creek. The plaintiffs further contended that their grant, No. 2325, should be located on the west or northwest side of Hazel Creek, and not where the defendants say it should be located, that is, considerably north of Hazel Creek and at a place which would not be designated as lying west or northwest of Hazel Creek, in describing its true location. For these reasons, the plaintiffs have argued before us that the court should not have excluded the entries from the consideration of the jury, and in this position we concur.

It is true that the description in the grant is paramount in locating the land, and must override that in the entry if the latter is in conflict with it, but the entry may be considered in determining the location of the land described in the grant, at least in cases of doubt as to the true location. The language of the court must have produced the impression upon the jury that they could only consider the description in the grant and what the surveyor did in locating the land, as they were told, among other things equally objectionable, that "the description in the grant constitutes the real location of the land, without regard to the entry." This was correct in one respect, but in order to ascertain what the grant really described and what the surveyor really did, it was competent to consider the entry, in this case at least, as the description in the grant would fit a tract of land on Eagle Creek as well as one on or near Haw Gap Creek at the place where defendants contend their entries were surveyed.

The court directed the jury to answer the fourth issue in the affirmative, without permitting them to pass upon the oral testimony introduced by the defendants to show that the title, which had been vested in Stephen Munday by the grants 1545 and 1546, and mesne conveyances, had passed out of him and had been acquired by them. This was an error, if we are to follow numerous decisions of this Court to the effect that the court cannot find any fact, but must leave even the credibility of the witnesses to the jury, however plain, direct, and conclusive the proof may appear to be, as the following cases will show:

"It is the province of the jury to find the fact involved in the issue or issues presented in the pleadings, and in all cases

the credibility of witnesses is exclusively for the jury to consider." *Burrus v. Insurance Co.,* 121 N. C., 62.

"The present case is not like either of these, for the State had not made out a case, unless the State's witness was believed, and the credibility of a witness must be passed on exclusively by the jury. It is true, from the case as made out, there could be but little room to doubt that both defendants were guilty, and the wonder is why the jury should have hesitated about convicting both. Still, that was a matter for the jury, and its being a plain case, although it accounts for, does not legalize, this novel mode in entering a verdict." *Justice Clark* in *S. v. Riley,* 113 N. C., 648.

"Both the issue and the credibility of the evidence offered tending to establish the position of either party in reference to it were for the jury and not for the court." *Justice Hoke* in *Bank v. Fountain,* 148 N. C., 590.

"The jury are the constitutional judges, not only of the truth of testimony, but of the conclusions of fact resulting therefrom. The evidence may, in the opinion of the court, have been ever so strong against the defendant, yet it was for the jury to find the ultimate fact of guilt, without any suggestion from the court, direct or indirect, as to what the finding should be." *S. v. R. R.,* 149 N. C., 470; *S. v. Simmons,* 143 N. C., 618; *Bank v. Pugh,* 8 N. C., 206; *S. v. Lilly,* 116 N. C., 1049.

Such an instruction also is expressly forbidden by statute. "No judge, in giving a charge to the petit jury, either in a civil or a criminal action, shall give an opinion whether a fact is fully or sufficiently proven, such matter being the true office and province of the jury; but he shall state in a plain and correct manner the evidence given in the case and declare and explain the law arising thereon." Revisal, sec. 535.

Where the facts are undisputed, the judge may direct a verdict in a civil, but not in a criminal case, and he cannot do so in either where the facts are not admitted and the credibility of the witnesses is involved.

There was no admission of facts in this case. The statement is that there was oral evidence, in addition to the documentary, tending to prove certain facts. The evidence is not set out, and

this, perhaps, is not material, as it would still remain for the jury to decide as to the credibility of the witnesses, even if the evidence strongly tended to prove the facts in issue. The plaintiff had denied the defendants' title, and the burden, therefore, was upon the latter to establish it in every particular. The same error was committed in charging the jury as to plaintiffs' title, but the defendant did not except and appeal, and we cannot review the judge in this respect.

There are other errors assigned by the defendant, but it is not necessary to discuss them. The error as to the entries permeated the entire case and was not confined to the defendants' title. It was just as competent for the plaintiffs to use their entry in locating the land described in Grant 2325, as it was for them to use defendants' entries in order to show that they had not properly located their land. But an error on either side would induce us to award a general new trial, as the two locations are so closely related.

The issues do not strongly commend themselves to us. They are unusual, somewhat involved, and may have misled the jury. It is better to follow the beaten path and submit the ordinary issues in such cases. Issues are raised by the pleadings, and should be framed accordingly, unless the parties agree upon special issues, but that is not so in this case. The plaintiffs objected to each of the issues, and they are not those made by the pleadings.

New trial.