UNITED STATES v. SWAIN COUNTY, N. C.

District Court, W. D. North Carolina.
Dec. 17, 1930.

Thos. J. Harkins, U. S. Atty., of Asheville, N. C.

Edwards & Leatherwood, of Bryson City, N. C., and Alley & Alley, of Waynesville, N. C., for defendants.

**WEBB, District Judge.**

This is a suit in equity, brought by the United States against the sheriff, the county commissioners, and the register of deeds, of Swain county, N. C., to enjoin those duly constituted authorities from the collection of taxes assessed by them, for state and county purposes, against the lands of what is known as the "Eastern Band of Cherokee Indians," for the year 1926. This Eastern Band of Cherokee Indians is a corporation, organized by an act of the Legislature of North Carolina in the year 1889.

To satisfy the levy of taxes due upon the land owned by this corporation, these lands were advertised and sold, and Swain county became the purchaser of the same at the sale. However, before conveyance was executed pursuant to the sale, this suit was brought by the complainant for the purpose of canceling and annulling said assessment, and to have declared void the sale of the lands, and to restrain the sheriff and tax collector from making a deed for same.

The defendants, in behalf of Swain county, answered the bill of complaint and admitted most of the allegations of the bill, but denied that the tax assessment was illegal, and asserted the right of Swain county to assess and collect these taxes against the lands of the Eastern Band of Cherokee Indians, lying within Swain county, for both state and county purposes.

The defendants assert that the act of Congress of June 4, 1924 (43 Stat. at Large 376 [25 USCA § 331 note]), attempting to exempt these lands from such taxation, is void and unconstitutional. This act authorizes the Eastern Band of Cherokee Indians to convey to the United States in their right all the lands, money, and property of the Eastern Band of Cherokee Indians for final disposition as provided in the act, and provides further for a roll of the members for allotment of lands to the individual members of the band, and the manner of making the allotment, and numerous details for carrying out the provisions of the act.

This act contains the further provision:

"That such restricted and undivided property shall be exempt from sale for unpaid taxes for two years from the date when such taxes become due and payable," etc. Section 21.

And further provides:

"After the expiration of the tax year following that in which this Act is approved all lands allotted to members of said band, from which restrictions shall have been removed, shall be subject to taxation the same as other lands. But from and after the expiration of said tax year all restricted allotments and undivided property shall be exempt from taxation until the restrictions on the alienation of such allotments are removed or the title of the band to such undivided property is extinguished." (Section 21.)

The only question before the court is: Has Congress the power to exempt these lands from state and county taxes?

Before discussing the constitutionality of this act, I think it proper that we should consider the rights of the Indians in North America to the lands which they occupied or used as their hunting and fishing grounds when this continent was discovered.

Chief Justice Marshall, in the case of Johnson & Graham's Lessee v. William M'Intosh, 8 Wheat. 543, 574, 5 L. Ed. 681, says, among other things, that:

"The power of the Indians to dispose of the soil, at their own will, to whomsoever they pleased, was denied by the original fundamental principle, that discovery gave exclusive title to those who made it."

The great Chief Justice further said in this opinion:

"In this first effort made by the English government to acquire territory on this continent, we perceive a complete recognition of the principle which has been mentioned. The right of discovery given by this commission, is confined to countries 'then unknown to all Christian people'; and of these countries, Cabot was empowered to take possession in the name of the king of England. * * * While the different nations of Europe respected the right of the natives, as occupants, they asserted the ultimate dominion to be in themselves; and claimed and exercised, as a consequence of this ultimate dominion, a power to grant the soil, while yet in possession of the natives. These grants have been understood by all, to convey a title to the grantees, subject only to the Indian right of occupancy."

Continuing, Chief Justice Marshall said:

"The same principle continued to be recognized. The charter granted to Sir Humphrey Gilbert, in 1578, authorizes him to discover and take possession of such remote, heathen and barbarous lands, as were not ac-

tually possessed by any Christian prince or people. This charter was afterwards renewed to Sir Walter Raleigh, in nearly the same terms. * * * Thus has our whole country been granted by the crown, while in the occupation of the Indians. These grants purport to convey the soil as well as the right of dominion to the grantees. * * * Thus, all the nations of Europe, who have acquired territory on this continent, have asserted in themselves, and have recognized in others, the exclusive right of the discoverer to appropriate the lands occupied by the Indians. Have the American states rejected or adopted this principle?

"By the treaty which concluded the war of our revolution, Great Britain relinquished all claim, not only to the government, but to the 'propriety and territorial rights of the United States,' whose boundaries were fixed in the second article. By this treaty, the powers of government, and the right to soil, which had previously been in Great Britain, passed definitely to these states. We had before taken possession of them, by declaring independence. * * * It has never been doubted, that either the United States, or the several states, had a clear title to all the lands within the boundary lines described in the treaty, subject only to the Indian right of occupancy, and that the exclusive power to extinguish that right, was vested in that government which might constitutionally exercise it. * * * The United States, then, have unequivocally acceded to that great and broad rule by which its civilized inhabitants now hold this country. They hold, and assert in themselves, the title by which it was acquired. They maintain, as all others have maintained, that discovery gave an exclusive right to extinguish the Indian title of occupancy, either by purchase or by conquest. * * * The British government, which was then our government, and whose rights have passed to the United States, asserted a title to all the lands occupied by Indians, within the chartered limits of the British colonies."

North Carolina and the lands in controversy were a part of the territory described in this opinion.

Again we find Chief Justice Marshall delivering the opinion of the court in the case of Worcester v. Georgia, 6 Pet. 515, 543, 8 L. Ed. 483, and declaring:

"The great maritime powers of Europe discovered and visited different parts of this continent, at nearly the same time. The object was too immense for any one of them to grasp the whole; and the claimants were too powerful to submit to the exclusive or unreasonable pretentions of any single potentate. To avoid bloody conflicts, which might terminate disastrously to all, it was necessary for the nations of Europe to establish some principle which all would acknowledge, and which should decide their respective rights as between themselves. This principle, suggested by the actual state of things, was, 'that discovery gave title to the government by whose subjects, or by whose authority, it was made, against all other European governments, which title might be consummated by possession.' * * * This principle, acknowledged by all Europeans, * * * gave to the nation making the discovery * * * sole right of acquiring the soil and of making settlements on it."

By common consent it may be admitted that most of the continent of North America at one time belonged to Great Britain by right of discovery. Certainly Great Britain owned the territory comprising the boundaries of the thirteen original states. The King of England established the Virginia colony, and at one time North Carolina was one of Virginia's colonies, and at that time the Indians were in pretty general occupancy and control of practically all of the land in North Carolina. So, whatever title Great Britain had to the lands in North America, including North Carolina, was transferred to the thirteen original states in the treaty of peace, executed at Paris on September 3, 1783 (8 Stat. 80), and ratified by Congress on January 14, 1784.

The principal article of this famous document declares:

"His Britannic Majesty acknowledges the said United States, viz. New Hampshire, Massachusetts-Bay, Rhode Island and Providence Plantations, Connecticut, New York, New Jersey, Pennsylvania, Delaware, Maryland, Virginia, North Carolina, South Carolina, and Georgia, to be free, sovereign and independent States; that he treats with them as such; and for himself, his heirs and successors, relinquishes all claims to the government, propriety and territorial rights of the same, and every part thereof."

The word "propriety" in this first article of the treaty means "exclusive right of property, property."

The Revolutionary War was fought and won by the individual states, and as confederated sovereigns. So, the King of England ceded to these individual states all of the lands within their respective boundaries.

102

In the Articles of Confederation of 1777 the states were careful to give to the Congress the power, only, to regulate "trade and managing all affairs with the Indians, not members of any of the States, provided that the legislative right of any State within its own limits be not infringed or violated." Article 9. It is therefore clear that the states which banded themselves together and won their freedom from Great Britain understood that the lands within their borders, occupied by Indians, belonged to these individual states, and Congress could only manage the affairs of the Indians and regulate their trade when such Indians were not members of any of the respective states. In other words, it would seem that those states reserved to themselves, respectively, the right to manage the affairs of the Indians within their respective borders.

There has never been any historic or judicial denial, so far as I know, of the statement that these original states succeeded to Great Britain's title when the Revolutionary War ended, and there has never been any contention or pretension to the effect that the federal government, either under the Articles of Confederation or under the Constitution of the United States, ever owned any lands as public domain within the borders of these states. Therefore, when the Constitution of the United States, which provided for the creation of the Congress which passed the act under consideration by the court in this case, was adopted, every state joining the federal government, including North Carolina, had title to all of the lands within its own borders. In other words, there was no public domain in North Carolina when the Constitution of the United States was adopted.

It is not doubted that Congress had the power to control all the public domain—that is, land owned by the United States as territory—and place whatever restrictions it pleased on the states created by Congress, with reference to Indian lands or other matters; but it must be understood that North Carolina was a state and owned all the land within her borders before the Constitution of the United States was formed or Congress created.

When North Carolina was asked by the Congress to cede Tennessee, in order that a new state might be made of this territory, it was an acknowledgment on the part of Congress that North Carolina owned the land she was asked to cede. The Constitution of the United States gave the Congress the right to regulate commerce with the Indian tribes, and in that instrument the President was given the power, with the advice and consent of the Senate, to make treaties; and all of the intercourse and transactions that have taken place between the United States and the Indian nations or tribes are based upon these two clauses in the Constitution.

There is no clause in the Constitution giving Congress the power to exempt any lands belonging to the thirteen original states from taxation. Of course, it is universally understood and held that government acquired and owned property within such states, which is used as a government instrumentality, is not and cannot be taxed by the state. Neither will the federal government tax like property owned by the respective states.

Before the Constitution of the United States was adopted, North Carolina was making her own treaties with the Indians within her borders, and only surrendered the right to regulate Indian affairs and make treaties with them to the federal government. Our own North Carolina Supreme Court, in the case of Strother v. Cathey, 5 N. C. 162, 3 Am. Dec. 683, in construing the Treaty of July 2, 1791 (7 Stat. 39), between the United States and the Cherokee Nation, says:

"These lands having once belonged to the state of North Carolina and having been granted by that state to the use of the Indian Nation revested in the state when that use expired, and the Indians release all claim to the same. No expression is used in the treaty to convey these lands to the general government; and although the Indian title was extinguished by the general government it does not follow that the title rests in them, for since the adoption of the federal constitution the power of making treaties, is surrendered by each state to the general government and through them alone Indian claims are to be extinguished; and these lands lying within the boundary of this state, acknowledged by the federal government when received into the Union, must remain the lands of this state until she cedes them away."

In the case of Fletcher v. Peck, 6 Cranch, 120, 3 L. Ed. 162, the Supreme Court of the United States says:

"At the treaty of peace, there was no idea of a cession of land to the United States, by Great Britain. The bounds of the United States were fixed as the bounds of the several states had been before fixed. The United States did not claim land for the United States as a nation; they claimed only in right of the individual states. Great Britain

yielded the principle of the royal right to disannex lands from the colonies, and acquiesced in the principle contended for by the United States, which was the old boundary of the several states. * * * The United States then had no title by the treaty of peace. * * * There is nothing in the constitution of the United States, which can give her a title. * * * The right of disposing of the lands belonging to the state naturally devolved upon the legislative body. * * * A doubt has been suggested whether this power extends to lands to which the Indian title has not been extinguished. What is the Indian title? It is a mere occupancy for the purpose of hunting. It is not like our tenures; they have no idea of a title to the soil itself. It is overrun by them, rather than inhabited. It is not a true and legal possession. * * * It is a right not to be transferred but extinguished."

The Cherokee Nation was one of the largest of the Indian tribes in North America, and at the time North Carolina became a member of the Federal Union, there were in North Carolina, Georgia, Alabama, and Mississippi probably twenty thousand of these half-civilized people. By degrees the state and the federal government secured agreements with these Indians to move their hunting grounds further west. At one time the Blue Ridge Mountains was the eastern boundary of their hunting grounds; and, as the Indians moved back from the coast of North Carolina to the mountains, the lands that they left were immediately opened to entry, and grants for them were issued by the state of North Carolina. The federal government never claimed title to such lands, and they never became a part of the public domain.

Indeed, it has been asserted, and I think established, that all the lands involved in this suit were granted by the state to various grantees either before or after the Cherokee Indians as a nation moved west of the Mississippi river. It is certain that the Eastern Band of Cherokee Indians holds its title to the lands in question by reason of state grants or through mesne conveyances. Whatever rights to any lands in North Carolina the Cherokee Nation ever had were surrendered and completely extinguished by

#### The Treaty of New Echota.

Carrying out the policy of the United States to secure the removal of the Indians as rapidly as possible, and to establish these Indians in new homes on the public domain west of the Mississippi river, the United States, through its commissioners, finally negotiated a treaty with the Cherokee Indians as a nation on December 29, 1835, which was proclaimed May 23, 1836 (7 Stat. 478). This treaty provides that for certain considerations of money and land to be given and assigned to the Indians, the Cherokee Indians are to remove to the west of the Mississippi river and occupy "said * * * millions of acres of land as far west as the sovereignty of the United States and their right of soil extend," etc. Article 2.

The Cherokees in this treaty agreed to move west within two years from the ratification of the treaty; and the treaty further provides that the United States and the several states interested in the Cherokee lands shall immediately proceed to survey the land ceded by this treaty; but the agency buildings and tract surveyed and laid off for the use of Col. Meigs, Indian agent, shall continue subject to the control of the United States or such agent as may be specially engaged to superintend the removal of the tribe.

Article 12 of this treaty provides that:

Such Cherokees as "are averse to a removal to the Cherokee country west of the Mississippi and are desirous to become citizens of the States where they reside and such as are qualified to take care of themselves and their property shall be entitled to receive their due portion of all the personal benefits accruing under this treaty for their claims, improvements and per capita."

This article 12 originally provided that:

"Such heads of Cherokee families as are desirous to reside within the States of Nor. Carolina Tennessee and Alabama subject to the laws of the same; and who are qualified or calculated to become useful citizens shall be entitled * * * to a pre-emption right to one hundred and sixty acres * * * at the minimum Congress price; so as to include the present buildings or improvements."

But President Jackson was opposed to any preemptions or reservations, his desire being that the whole Cherokee people should remove together to the country west of the Mississippi, and so Supplementary Articles to the main treaty were agreed upon March 1, 1836 (7 Stat. 488), and proclaimed with the main treaty May 23, 1836, and article 1 of this Supplementary Treaty provides:

"All the pre-emption rights and reservations provided for in articles 12 and 13 shall be and are hereby relinquished and declared void."

It is claimed by counsel for the complainant in his very able brief that:

"Article 12 of the Treaty of New Echota makes provision for such of the Cherokee Indians as did not desire to move to the new country west of the Mississippi to remain in North Carolina, and to have the privilege of occupying a portion of the Cherokee lands in this state."

"By this provision in the treaty," the brief continues, "it cannot be claimed that North Carolina had the right to assume sovereignty and ownership of the lands specifically reserved by the United States for the Cherokees who remained in the state. These Indians who remained in the old Indian country in North Carolina were occupying these lands and have continued to occupy them since then, including the boundary known as 'the Qualla Boundary'; the same being the lands in controversy in this action."

It will be seen that this contention of the complainant is not good, and counsel must have overlooked the fact that the pre-emption clause contained in article 12 of the New Echota Treaty was eliminated and declared void by article 1 of the Supplementary Articles of this treaty. So, when the Treaty of New Echota took effect, no rights with reference to lands in North Carolina were given to those Indians refusing to move west; their only right being to become citizens of the states where they resided, if qualified to take care of themselves; and to receive their proportion of the personal benefits accruing under the treaty including the per capita allowance. Therefore, I cannot agree that the treaty of New Echota reserved any lands in North Carolina for any Indians of the Cherokee Nation or Tribe.

The court must hold, therefore, that, upon the conclusion and promulgation of the Treaty of New Echota, with its supplemental sections, the last vestige of right the Indians may have had to occupy lands east of the Mississippi was extinguished, and the right of occupancy immediately vested in the state, which already had the fee-simple title. This was clearly understood by the makers of this treaty and by the Senate and the President, because section 16 of this historic document provides that these lands ceded by the Indians shall be immediately surveyed by the United States and the several states interested, the states surveying the lands within their borders and the United States surveying the lands in her territorial boundary. After the Cherokees had ratified this treaty, the lands formerly occupied by them in Georgia were thrown open to entry and sale, just as similar lands were thrown open to entry and sale in North Carolina and Tennessee. Indeed, it was held in the case of Lattimer et al. v. William Poteet, 14 Pet. 4, 10 L. Ed. 328, that:

"The Indian title being a right of occupancy, the State of North Carolina had the power to grant the fee in those lands subject to this right."

The Supreme Court of the United States in the case of Cherokee Trust Funds, 117 U. S. 288, 6 S. Ct. 718, 722, 29 L. Ed. 880, discussing the effect of this treaty, says:

"The United States had as early as 1802, agreed with Georgia, in consideration of her cession of western lands, to extinguish the Indian title to lands within the state. North Carolina claimed that the United States were under a similar obligation to extinguish the Indian title to lands within her limits, in consideration of a like cession of western lands, * * * and with the extinguishment of their title, it was expected that the Indians themselves would be removed to territory beyond the bounds of those states. * * * Severe and oppressive laws were passed by Georgia in order to compel them to leave; and, though less severity was practiced in North Carolina towards the Indians in that state, an equally pronounced desire for their departure was expressed. Angry and violent disputes between them and the white people in both states, but more particularly in Georgia, were of frequent occurrence. * * *

"The treaty of New Echota was made to put an end to those troubles, and to secure the reunion of the divided nation. * * * Those individuals and families that were averse to removal, and were desirous to become citizens of the state wherein they resided, and such as were qualified to take care of themselves and their property, should be entitled to receive their due proportion of all the personal benefits arising under the treaty for their claims, improvements, and their per capita. * * * Great reluctance to go was manifested by large numbers, and at last it became necessary to make a display of force to compel their removal. The lieutenant general [Major General Scott] was sent to the country with troops, and instructed to remove all the Indians except such as were entitled to remain and become citizens under the twelfth article of the treaty. The number that remained was between eleven and twelve hundred. They were without organization or a collective name. They ceased to be a part of the Cherokee nation, and henceforth they

became citizens of and were subject to the laws of the state in which they resided.

\* \* \*

"Their treaties of cession must therefore be held, not only to convey the common property of the nation, but to divest the interest therein of each of its members. Such was substantially the language and the decision of the attorney general of the United States in a communication made to the president, in 1845, with reference to the treaty of New Echota.

" 'The executive of the United States,' he said, 'must therefore regard the treaty of New Echota as binding on the whole Cherokee tribe; and the Indians, whether in Georgia, Alabama, Tennessee, or North Carolina, are bound by its provisions.' \* \* \*

"The Cherokees in North Carolina dissolved their connection with their nation when they refused to accompany the body of it on its removal, and they have had no separate political organization since. Whatever union they may have had among themselves has been merely a social or business one. \* \* \* They have never been recognized as a separate nation by the United States; no treaty has been made with them; they can pass no laws; they are citizens of that state, and bound by its laws."

From the plain interpretation of that treaty, made very clear by the Supreme Court of the United States in the Cherokee Trust Funds Case, it is beyond question a fact that when this treaty was made, whatever rights the Cherokee Indians individually and as a nation had to the occupancy of the lands in question was extinguished then and there absolutely as to the whole nation, and as to every individual member of the nation or tribe. The ancestors of the present band of Cherokee Indians refused to cross the Mississippi, and preferred to take their chances as individuals here in North Carolina, relying upon the hospitality and the laws of North Carolina, and subjected themselves as completely to her laws as any white citizen could do.

We find the Supreme Court of North Carolina, in Westfelt v. Adams, 159 N. C. 409-414, 74 S. E. 1041, 1042, saying:

"The Indian title, or right of occupation, was extinguished by the following treaties made and concluded between the United States and the Cherokee Nation or Tribe of Indians."

After the Treaty of New Echota, the Indians remaining in North Carolina could, under the Constitution and the laws of the state, take and hold lands by grant. Colvord v. Monroe, 63 N. C. 288.

Ever since the signing of the Treaty of New Echota, I think it has been universally understood that the Cherokee Indians, as a tribe or as a nation, surrendered whatever right they may have had in toto in the lands formerly occupied by them in Western North Carolina. Indeed, this was the understanding of those Cherokee Indians themselves who refused to go west with the tribe. They and their friends knew that they had no lands left to them. The United States understood this. There was never any allotment, either by the state of North Carolina or by the United States, of any lands in North Carolina to any Indian that refused to migrate. This understanding was thoroughly held and expressed by the Supreme Court of the United States in the Cherokee Trust Funds Case, heretofore referred to, wherein that court passed finally upon this question and held that the Treaty of New Echota not only conveyed the common property of the nation, but divested the interest therein of each of its members.

So the Indians who refused to migrate west of the Mississippi river became roving, homeless citizens of North Carolina. They claimed no land. They claimed no property allotments; but did claim their per capita allowance under the Treaty of New Echota. Under these circumstances the individual Indians were in a pitiable condition. They had no lands and no homes, and the federal government refused to pay them the per capita moneys due them until they either moved to the Indian Territory or secured an act of the Legislature of North Carolina allowing them to remain permanently in this state. The North Carolina Legislature of 1866 assumed a kindly attitude towards these friendless people and promptly passed an act allowing them to remain in North Carolina. This little band of Indians undertook to effect a tribal organization or constitution to live under; but the Supreme Court of the United States, in the Cherokee Trust Funds Case, as before pointed out, held that these Indians remaining in North Carolina had no tribal or national existence and had no power to form a constitution or tribal organization. Whereupon the Legislature of North Carolina again came to their rescue, and incorporated them under the corporate name of "Eastern Band of Cherokee Indians," and by this act, and subsequent amendments, this corporate band was given machinery for their government, providing for the holding of an

election each four years for chief, council, and other officers, and clothed the council with power to regulate and manage the band and its property; and such tribal government as they have, or ever have had, is given by these acts of the Legislature of North Carolina, and not by any act of Congress. Since these Indians were thus incorporated by the Legislature of North Carolina, the United States, the complainant herein, has dealt with these Indians as a legal corporate entity, and has recognized them as a private state corporation.

At the time of their incorporation by the Legislature, they possessed the lands involved in this suit. At this point it may be well to state how these Indians came into possession of the land in question. As before noted, at the time of the general removal of the Cherokee Indians under the Treaty of New Echota, many individuals fled to the mountains of Tennessee and North Carolina, and refused to migrate; and these rebellious Indians were denied, by the United States, the personal benefits provided for in the Treaty of New Echota, until they had moved west, and these Indians were permitted to roam throughout the forests of Western North Carolina for ten years, when finally the Congress of the United States, in 1848 (9 Stat. 264, § 4), provided for a census to be taken of this remaining band in North Carolina, and appropriated money enough to pay each of them $53.33⅓, with interest on same from the 23d of May, 1836, the date of the New Echota Treaty. The census provided for was duly taken, and the number of Indians entitled to the benefits of this appropriation was found to be 1517, which by additions was increased to 2,133 by 1,849.

Alfred Chapman, a representative of the Interior Department, was selected to make the per capita payment. But the execution of this act was based upon the further condition that assurance should be given by the state of North Carolina before such payments should be made that the Cherokees in question should be permitted to remain permanently in North Carolina. This desired legislation, as before mentioned, was given by the Legislature of North Carolina on February 19, 1866. The money to be distributed among these Indians was not paid them at that time, but was carried to the surplus fund in the treasury, and was later by the act of March 3, 1875 (18 Stat. 447), made available to assist in the purchase of, and payment for, land and the expenses of quieting titles, which land one Thomas had theretofore bought for them.

William H. Thomas, a friend of the Indians, had collected money from various sources, and taken the money of these Cherokee Indians, and with it had bought them homes and these lands in what is now Swain county. Mr. Thomas was the personal agent and trustee of these Indians between 1836 and 1861, and had received from them and for their benefit large sums of money, which sums of money were invested by him in these boundaries of land, as well as in a number of detached tracts, taking the legal title to these lands in himself. He became non compos mentis, and a suit in behalf of the Indians was brought in the United States court against him and one William Johnston, a creditor of Thomas.

In 1874, by order of the Circuit Court, the matters in dispute between the Indians and Thomas and Johnston were by agreement submitted to a board of arbitrators. The arbitrators made their report and award in November, 1874. The award finds that Thomas did purchase for these Indians and with their funds a large tract of land, known as the "Qualla Boundary," and estimated by the arbitrators to contain fifty thousand acres. The award declares that said tract belongs to, and shall be held by, the Eastern Band of Cherokees. It should be noted that the Qualla Boundary is the land in question. This award also determines the titles of a large number of individual Indians to tracts of land outside of the Qualla Boundary.

The award further found that the Indians owed Thomas a balance of money on the Qualla Boundary of $18,250, from which should be deducted the sum of $6,500, paid by the Indians to Johnston. The award further found that one Terrell and his bondsmen were responsible to the Indians for an unaccounted for balance of $2,697.89, which should be deducted from the amount due Thomas, leaving a net balance due from the Indians on the purchase money of the Qualla Boundary of $7,066. Upon the payment of this sum, the award declares, the Indians shall be entitled to a conveyance from Johnston of the legal title to all the land embraced within that boundary.

In the interesting case of Frazier v. Cherokee Indians, 146 N. C. 477, 59 S. E. 1005, 1007, the court says:

"The North Carolina Cherokees were entitled to certain moneys after the war, and the United States refused to pay it over to them unless they moved to the Indian Territory, or secured an act of the Legislature of North Carolina allowing them to remain per-

manently in this state. Such act was promptly passed by the Legislature. Laws 1866, p. 120, c. 54."

Chief Justice Clark, in the opinion in Frazier v. Cherokee Indians, 146 N. C. 477, 59 S. E. 1005, gives an interesting history of the kindly attitude North Carolina has assumed toward this remnant band.

I have set forth the foregoing history of how these Cherokees came into possession of the lands now in controversy for the purpose of making it clear that the lands were purchased for or by these Indians either from individuals or from the state. This title to the Qualla Boundary so acquired was at that time, and has ever been, recognized by the federal government. This land was not given to the Indians by reason of any treaty with the federal government or by any act of Congress. It was acquired by the Indians as all the lands now held in North Carolina have been acquired; that is, by grant from the state or through mesne conveyances. So far as my investigation goes—and I have made a very thorough study of this question —I cannot find that the federal authorities ever claimed this land for the Indians by reason of their peculiar status or by reason of any treaty or other federal action; and so this Eastern Band of Cherokee Indians has paid taxes on the land in question from the time the title was vested in it. Unquestionably, the government of the United States has recognized the title as having come from the state, as shown by the act of Congress of September 7, 1892. In 1890 this same land was assessed for taxes, and on account of nonpayment was sold to D. W. Kerr. Congress at that time, recognizing the justness of the claim for taxes of Swain county, passed the act referred to, and authorized the payment of the taxes; whereupon D. W. Kerr and his wife reconveyed these lands to the Eastern Band of Cherokee Indians, and this Band has continuously paid taxes, both county and state, up to the passage of the statute involved in this suit, to wit, June 4, 1924.

The act of Congress of August 4, 1892, c. 376 (27th Stat. 348), provides that the Secretary of the Interior shall use such amount of the funds to the credit of the Eastern Band of Cherokee Indians as may be necessary "for the payment annually of taxes upon such of their lands as are held in common, and also for the payment of the taxes that have already accrued, and for which the said lands were sold, together with costs incurred upon conveyance of purchasers of said lands to said Eastern Band."

It is contended with force by the defendants' counsel that this act, being a private special statute, is in the nature of a contract with the state, and after it has once gone into effect, Congress has no power to abrogate the rights under it. It does appear absolutely certain that Congress in 1892, by the passage of this act, did not dispute the right of Swain county and North Carolina to tax these lands, by paying the taxes then accrued, and providing for the regular annual payment of them in the future out of the Indian funds.

The lands in question have been taxed by the county and state, so far as my investigation goes, from 1836 down to 1924, a period of eighty-nine years. During all this time the federal government has known and acquiesced in, and, indeed, has paid these taxes; and such acquiescence might be regarded as an agreement or understanding on the part of the federal government that these lands are, and have always been, subject to taxation by the state authorities.

On this point I quote from the opinion of Judge Woods, of Indiana, in the case of Strack v. Aldrich (C. C.) 28 F. 489, 499:

"In Given v. Wright, 117 U. S. 648, 6 S. Ct. 907 [29 L. Ed. 1021], it is held that a long acquiescence in the imposition of taxes may raise a presumption of a surrender of the privilege of exemption."

Indeed, the act of Congress passed in 1892, providing that the Secretary of the Interior should annually pay the county and state taxes on these lands, is tantamount to an assertion and agreement on the part of Congress that these lands are, and were, justly liable for such taxes.

These Indians have always been subject to the criminal laws of North Carolina, and are punishable in her courts for offences they commit, and other persons are punished for offences committed against them. These Indians, as individuals, go into her courts for the redress of their grievances. They use the public roads built at the expense of the state and of the county. The federal government maintains a school for them, and in view of this fact the Indians are not required to pay taxes for the support of the state or county schools. These Indians are voters in North Carolina, and have voted for many years, when qualified under the Constitution and laws of the state.

In the case of United States v. Boyd (C. C.) 68 F. 577, 579, the court says:

"But it must not be understood that these Cherokee Indians, although not citizens of the United States, and still under pupilage, are independent of the state of North Carolina. They live within her territory. They hold lands under her sovereignty, under her tenure. They are in daily contact with her people. They are not a nation nor a tribe. They can enjoy privileges she may grant. They are subject to her criminal laws. None of the laws applicable to Indian reservations applies to them."

The Indians comprising the Eastern Band of Cherokee Indians were made citizens of the United States by the Act of Congress of June 4, 1924 (43 Stat. 376 [25 USCA § 331 note (p. 189, § 19)]).

In the well-considered case of Union P. Railroad Co. v. Peniston, 18 Wall. 29, 21 L. Ed. 787, the Supreme Court of the United States well and clearly stated:

"That the taxing power of a State is one of its attributes of sovereignty; that it exists independently of the Constitution of the United States, and underived from that instrument; and that it may be exercised to an unlimited extent upon all property, trades, business, and avocations existing or carried on within the territorial boundaries of the State, except so far as it has been surrendered to the Federal government, either expressly or by necessary implication, are propositions that have often been asserted by this court. And in thus acknowledging the extent of the power to tax belonging to the States, we have declared that it is indispensable to their continued existence. * * * And the Constitution contains no express restriction of this power other than a prohibition to lay any duty of tonnage, or any impost, or duty on imports or exports, except what may be absolutely necessary for executing the State's inspection laws. * * * The States are, and they must ever be, coexistent with the National government. Neither may destroy the other. Hence the Federal Constitution must receive a practical construction. Its limitations and its implied prohibitions must not be extended so far as to destroy the necessary powers of the States, or prevent their efficient exercise."

Counsel for complainant contends that the winding up of the tenancy in common of these Indians is in some way an instrumentality of the government, and he cites in support of that contention the famous case of McCulloch v. Maryland, 4 Wheat. 316, 436,

4 L. Ed. 579; but I cannot find support for this contention in the opinion of Chief Justice Marshall in this famed case. The only question there was whether or not the state of Maryland could tax the business or right to do business of the Bank of the United States. The bank was created by an act of Congress as an important instrumentality of the government. Maryland had attempted by a legislative act to levy a $15,000 annual franchise tax on this bank, and the Supreme Court declared this tax unconstitutional because this bank was an instrumentality of the Government. This bank owned real estate in Maryland, and the Chief Justice, in the last paragraph of his celebrated opinion, is careful to say:

"This opinion does not deprive the States of any resources which they originally possessed. It does not extend to a tax paid by the real property of the bank, in common with the other real property within the State, nor to a tax imposed on the interest which the citizens of Maryland may hold in this institution, in common with other property of the same description throughout the State. But this is a tax on the operations of the bank, and is, consequently, a tax on the operation of an instrument employed by the government of the Union to carry its powers into execution. Such a tax must be unconstitutional."

It will be seen that even in this case where an instrumentality of the government, to wit, the United States Bank, owned real estate within the state of Maryland, the Chief Justice holds that the state of Maryland could levy a tax upon its real estate.

In the case of Union P. Railroad Co. v. Peniston, referred to above, the Supreme Court held that although a railroad corporation chartered by Congress, which Congress assisted by donations and loans, of whose board of directors the government appoints two, and which makes annual reports to the government, and whose railroad and telegraph lines are subject to the regulations imposed by its charter, and subject to such further regulations as Congress may make, and to which the Congress has donated many millions of dollars, and to which Congress makes grants of land, and that said railroad should transmit dispatches and transport mails, troops and munitions of war, supplies and public stores for the government whenever required to do so by any department thereof, such corporation is not an instrumentality of the government to the extent that its real estate may not be taxed by the state of Nebras-

ka. It cannot be argued with force that the ownership of a few thousand acres of mountain land in Swain county, N. C., by a small band of Indians, is in any sense an instrumentality of the government.

The corporation known as the Eastern Band of Cherokee Indians was not created by an act of Congress. The land on which they now live, according to my conception, was never owned by the federal government, and the President and the Senate have never made any treaty with this band providing that their land should be exempt from state and county taxation. I cannot see, therefore, that the levying of taxes by Swain county on these lands at the same rates that other lands are assessed in that county can in any way be regarded as a tax burden on an instrumentality of the government of the United States.

If the Treaty of Hopewell, 1785, and the Holston Treaty, 1791, were in force to-day and the Cherokees were still living on these lands under these treaties, and it were clear that the land in question was within the boundary of these two treaties, about which there is dispute, then there would be much force in the argument that the federal government might under these treaties exempt said lands from taxation; but I must repeat that in my view of the case, these treaties have nothing to do with the lands in question, because the New Echota Treaty extinguished all of the rights of the Cherokee Indians, and every individual member thereof, in and to not only the land in question, but to all lands east of the Mississippi river, which included lands in Tennessee, Georgia, Alabama, and North Carolina. There is no provision in any existing treaty that this Band of Cherokees in North Carolina should ever be allowed any portion of North Carolina soil after the signing of the New Echota Treaty. Not a foot of the land in question, since 1835, was ever allotted by the United States or by the state of North Carolina to any Indian band, tribe, or individual. The action of North Carolina with reference to these lands, made vacant by the Treaty of New Echota, was the same as she took towards all of the other Indian lands within her borders theretofore made vacant either by treaties of her own or by the treaties between the Indians and the federal government, to wit, offer them for entry and sale, which for a period of a hundred years was assented to, acquiesced in, and tacitly ratified by the federal government.

In my view of the case, I do not see that the Meigs and Freeman line, wherever its true location was, has anything to do with the merits of this case.

The complainant contends that:

"Aside from the question of original sovereignty over the lands in question they now belong to the Cherokee Indians, they having acquired them by actual purchase, and they have now, not only the right of occupancy, which they have always had, but their title by reason of the purchase is actual title in the soil."

The court agrees with this statement in so far as the actual purchase and actual title to the land in question is concerned, but cannot agree that the Indians always had the right to occupy the lands in question. Their right to occupy these lands came, not from any treaty with the United States or with North Carolina, but came because, with their personal money and with contributions collected by W. H. Thomas, the lands were actually bought from the state of North Carolina or other holders of conveyances to these lands, by this Band of Cherokee Indians; and they now, in the opinion of the court, hold these lands as tenants in common, and are still regarded as wards of the federal government by reason of a policy pursued by the government for the last 150 years; but the fact that they are wards of the government gives no more right to exemption from taxation than would be given to wards of other guardians scattered throughout North Carolina. There are many orphans throughout the state who have guardians, but the federal government has no power to exempt their lands from taxation. There are many flood sufferers and earthquake victims throughout the United States and the world, to whose relief the federal government has contributed money; but certainly it could not be argued that the lands which such sufferers might own within the boundaries of the various states could be exempted by the federal government from state taxation. Surely it cannot be argued that an Indian or an Indian tribe or family could go into the various states either actually or by an agent, and purchase with personal funds rural lands or city lots and claim exemption from state taxation by reason of the fact that they are Indians. Nor could Congress exempt such lands from state taxation. The particular character of a citizen of the United States or of a state does not take away from the several states the sovereign power of taxing his

lands within their respective boundaries, unless such lands were donated, allotted, and set apart to such individual by the federal government from and out of federal lands or public domain.

Some philanthropic friend might give one of the leading Indians of this band a valuable piece of property in the city of Asheville. If such were done, could it be argued that, because the United States still assumes a guardianship over such Indian, his property so acquired in Asheville could be exempted by Congress from state and county taxation? And yet the character of title that such Indian would have is the same as the title which this band now has, both being held under state tenure.

It is readily admitted and sustained by a long line of decisions of all of our state and federal courts that the public lands belonging to the United States may be granted, allotted, and set apart by the federal government with such restrictions, however long their duration may be, as the federal government might deem proper. But no such question arises in this case. It cannot be seriously argued that the federal government ever owned a foot of the lands involved in the instant case. It cannot be argued that the federal government ever allotted to the Band of Indians in question or to any individual thereof a single foot, acre, or boundary of land within the state of North Carolina. Ever since the treaty of peace between the Confederated States and Great Britain in 1783, the sovereign seisin, title, and ownership of the lands in question have been in the sovereign state of North Carolina, and that sovereign is the only power under the Constitution that can exempt these lands or any lands within her borders from taxation.

It is contended by counsel for complainant, in his brief, that:

"From this legislation it is the policy of Congress, where it is deemed necessary for the proper protection of the property of the Indians and the right of the United States to supervise their property and affairs, to exempt their lands and property from taxation."

This statement is undoubtedly true with reference to all lands in the public domain which were assigned to Indians by the United States, but I can find no instance in all the writings on Indian affairs, or in the multitude of judicial opinions, where the Congress has ever undertaken to exempt land from taxes where such land has been purchased by Indians from the state, as in the case at bar. The principle contended for by counsel applies only, so far as my reading goes, to nations or tribes of Indians occupying a part of the public domain; and it must be understood that the Indians, whose lands we are now discussing, have been declared by the highest court in the land to be not a tribe or a nation, and none of the laws applying to Indian nations or tribes have ever been applied to the Indians in question.

As before noted in this opinion, it has always been the unquestionable right of the Congress to place restrictions on such Indian lands as were owned by the United States as a part of the public domain, and when these lands became incorporated within the boundaries of a state created by Congress, that same body has always had the power in the enabling act to throw such restrictions around the Indians and their lands within these new states as the Congress might choose. Indeed, I think it is universally true that whenever new states have been carved out of the public domain, these states have been required by the enabling act to adopt in their Constitution and laws with reference to the Indians and their lands such restrictions and exemptions as Congress provided for in the enabling act.

Counsel has cited a number of cases where the courts have held that such lands were not subject to taxation by the newly created state; but these lands have always been a part of the United States public domain, and for this reason remained subject to the laws of the United States under the various treaties.

But the case before us is very different. Congress has for many years had supervisory charge over the persons and affairs of this band of Cherokee Indians. This they have done as a matter of charity and duty towards those more or less helpless people. By common consent the government has acted as a sort of guardian for the Indians of this band, but it has never been contended by any one, so far as I can gather, that the government ever owned the land in question or that they ever bought the land in question or ever gave it to the Indians. The doctrine set forth in United States v. Gray (C. C. A.) 284 F. 103, therefore does not seem to apply to the case at bar.

This principle is correct only when applied to such parts of the public domain as have been allotted by the federal authorities by treaty or by act of Congress to Indian tribes. It is not doubted that the United States can allot its own lands to Indians or

other persons with such restrictions or exemptions as it may deem proper to provide, and, as said before, wherever such lands have been later included within the boundary of a newly formed state, the Enabling Act has always required such state, in its laws or constitution, to respect the restrictions, exemptions, and the laws and treaties of the United States with reference to such Indian lands within the boundary of the state.

Counsel has cited many cases, all of which I have carefully read, tending to show that the Congress, under the various treaties affecting these public lands of the United States, has the power to exempt such lands from taxation for a definite or indefinite period of time. This proposition is not disputed; but it is asserted that the Congress has never undertaken in the history of the federal government to exempt lands like these in question from state and county taxation. Such exemptions have always occurred in cases where the land was originally owned by the federal government as a part of its wild lands or public domain.

To sustain complainant's contention, counsel cites the case of Brader v. James, 246 U. S. 88, 38 S. Ct. 285, 62 L. Ed. 591; but it will be noted that the lands in question in the case cited were lands within the state of Oklahoma, owned by the federal government as a part of its public domain, and restricted by legislation and by treaty on the part of the federal government, and also ratified and agreed to by the state of Oklahoma when it became a state, and concerned agreements and treaties with the Choctaw and Chickasaw Indians and the homestead allotment of a full-blooded Choctaw. As heretofore stated, there is no question that Congress has the right to exempt such lands, owned by the federal government and allotted to the Indians, from taxation for any period of time that Congress under the treaties might provide. But even in the case where the federal government owned the land and had allotted it to a full-blooded Indian, where the grantee sold her homestead allotment with the consent and under the supervision of the Secretary of the Interior, which was inalienable at the time without his consent, the proceeds thereof were paid to the Superintendent of the Civilized Tribes and held by him as a trust fund for Lizzie Lewis. With a portion of those funds there were purchased for Lizzie Lewis the lots conveyed by Showman's deed, and the purchase price thereof was disbursed by the superintendent under the orders, rules, and regulations of the Secretary of the Interior for the benefit of Lizzie Lew-

is. It was held by the court in the case of United States v. Gray (C. C. A.) 284 F. 103, that such lots, bought with such trust funds, were not exempt from state or county taxation. So far as the information of the court goes, no lands set apart to Indians by the United States out of the public domain have ever been allowed to be taxed by any of the states or territories whose boundaries included such lands; but we find no such course pursued by the federal government towards the lands now owned by the Eastern Band of Cherokee Indians in North Carolina. The reason appears to me to be patent, because of the clear, distinct difference in the character of the ownership and possession between the lands originally within one of the original thirteen states and lands wholly within a territory or new state created by act of Congress; the title to whose lands, in both new state and territory, was vested in and held by the federal government.

The first section of the act of Congress of February 8, 1887, chapter 119 (24 Stat. 388), does not and cannot apply to the lands in question, and was not intended to apply to the lands in question, because that section refers to Indians who have been "located upon any reservation created for their use, either by treaty stipulation or by virtue of an act of Congress or executive order setting apart the same for their use." The President may cause such reservation to be surveyed and allot the lands in severalty to such Indians. The lands in question do not come under this act, because there was never a "reservation created for their use" either by treaty or by an act of Congress or by an executive order. It is apparent that this act was never intended to apply to the land in question; for if it had, the act now under consideration in this case, to wit, the act of June 4, 1924, would not have been passed. The title to the act of February 8, 1887, shows this conclusion clearly, for it is entitled: "An act to provide for the allotment of lands in severalty to Indians on the various reservations, and to extend the protection of the laws of the United States and the territories over the Indians, and for other purposes." The Cherokee Indians in question occupy no reservation as generally understood.

The Act of February 14, 1923 (25 USCA § 335), amending the Act of February 8, 1887, cannot apply to the lands in question, and was not intended by Congress to apply to the lands in question, because the lands in question were never "purchased by Authority of Congress for the Use or Benefit of Any Individual Indian or Band or Tribe of In-

dians." If Congress had intended this act to apply to the lands of the Indians now under consideration, the act of June 4, 1924, which is now under consideration, would not have been passed.

For the foregoing reasons I am compelled to conclude and hold that the act of Congress of June 4, 1924, in so far as it attempts to exempt these Cherokee lands from state and county taxation, is unconstitutional and void.

In view of the certainty of feeling which I have that Congress will not suffer these lands to be sold for taxes, but will do as was done in 1892—pass an act providing for the payment of the taxes now due against them —I shall issue a supersedeas to continue for a sufficient length of time to allow the complainant to either carry this case by appeal to the Circuit Court of Appeals and the Supreme Court, or, in case no appeal is taken, I shall continue the supersedeas a reasonable time for Congress to take action in the matter.

### Decree.

This cause coming on to be heard, and being heard upon oral argument and exhaustive briefs by counsel, it is the opinion of the court that the act of Congress of June 4, 1924 (43 Stat. 376 [25 USCA § 331 note]), in so far as it attempts to exempt the lands in question from state and county taxation, is unconstitutional and void; and it is so adjudged.

It is further ordered and adjudged that the restraining order heretofore issued in this cause be dismissed.

It is further adjudged that the complainant pay the costs of this action.

This cause is retained for further orders. The clerk will enter.